### SHELL PETROLEUM CORPORATION v. VICTOR GASOLINE CO.*

No. 1294.

Circuit Court of Appeals, Tenth Circuit.

July 15, 1936.

Guy A. Thompson and Truman Post Young, both of St. Louis, Mo. (Cyrus S. Gentry and Thompson, Mitchell, Thomp-

*Rehearing denied Aug. 21, 1936.

son & Young, all of St. Louis, Mo., on the brief), for appellant.

Edgar Bronson Tolman, of Chicago, Ill., and M. Darwin Kirk, of Tulsa, Okl. (Henry Porter Chandler, of Chicago, Ill., on the brief), for appellee.

Before LEWIS, PHILLIPS, and BRATTON, Circuit Judges.

LEWIS, Circuit Judge.

Appellee recovered judgment for alleged balance on the purchase price of 18,266,725 gallons of natural gasoline shipped to appellant during ten months beginning with February, 1932, and ending November, 1932. The complaint was based on a contract between the parties. The answer contained a general denial and four counterclaims, which were put at issue by the reply. There is no controversy here on the counterclaims.

The contract by its terms was to run indefinitely beginning January 1, 1929, subject to a six-months cancellation notice from either side. It provides:

"The Seller agrees to sell and deliver to the Buyer and the Buyer agrees to purchase, receive and pay the Seller for the following quantity and quality of Natural Gasoline.

"The quantity shall be two hundred and fifty (250) tank cars of 8,000 gallons capacity each month.

"The material is to be of 'A' or 'AA' grade, specifications as issued by the Association of Natural Gasoline Manufacturers.

"V. Price.

"To be the monthly average price between the high and low quotations in Platt's Oilgram for grade 'AA' Natural Gasoline each month separately, in Group Three-Oklahoma, f.o.b. twenty-two cent (22c) Export freight rate, in Seller's tank cars, less one-quarter of a cent (¼c) per gallon. In no event will the maximum price which the Buyer shall pay be more than the monthly average price of 60/62, 400 endpoint Gasoline as published by Platt's Oilgram for Group Three-Oklahoma. The minimum price which the Seller shall receive shall in no event be lower than two cents (2c) below the monthly average quotation for 58/60 U. S. Motor Gasoline for Group Three-Oklahoma, as published by Platt's Oilgram."

In February, 1931, Platt's Oilgram ceased publication of prices for 60-62, 400 endpoint and 58-60 U. S. Motor gasoline, and because of that fact the parties agreed in writing that the Chicago Journal of Commerce should be substituted for Platt's Oilgram "as the publication which will govern minimum and maximum prices referred to in clause V of the contract." Up to September 30, 1931, the Chicago Journal of Commerce published price quotations on 58-60, 437 endpoint U. S. Motor gasoline, but on and after October 1, 1931, it ceased to publish quotations on 58-60, 437 endpoint U. S. Motor only, but added thereto other elements in three separate quotations: 58-60, 437 endpoint (U. S. Motor) below 57 octane; 57-64 octane; 65 and above octane. Thereafter it eliminated from its quotations "437 endpoint" and the figures "58-60" throughout the period in controversy, but retained the octanes in separate quotations, thus: U. S. Motor below 57 octane, U. S. Motor 57-64 octane, U. S. Motor 65 and up octane. For part of the time in controversy it added after 57 octane "3d Grd.," and after 57-64 octane the word "regular", and after 65 and up octane "Prem." for premium. It did not add these octanes to its quotations of 60-62, 400 endpoint until January 1, 1932, but from that date through the period in controversy it did so.

Beginning about 1926 there has been a gradual increase in the compression ratio in automobile engines. As that ratio increased engine knocking increased, and it became necessary to increase the antiknock qualities of the fuel. The development of the octane counts to eliminate the knocking was the result of much experimentation in the industry. It was found that "the higher the octane the slower the burning. The slower the burning the less the knock. That is because it is a slow push instead of a sudden explosion." Knocking is a property of the fuel used. Prior to the development of octanes gasolines had been graded principally by their gravities and endpoints. 60-62 and 58-60 found in the maximum and minimum price provisions in the contract signify gravity. 58-60 was not a specification of U. S. Motor gasoline. That was an additional item to U. S. Motor specifications put into the minimum price clause by the parties to the contract. At the time it was entered into the specifications of U. S. Motor gasoline

were these: initial boiling point 131° Fahrenheit; distillation 20% at 221°, 50% at 284°, 90% at 392°, endpoint 437°, at which latter point the recovery was to be 95%.

There was no attempt on the part of plaintiff in presenting its case to prove that the quotations on "U. S. Motor gasoline" with the octane counts were for the same commodity chemically as 58-60 U. S. Motor gasoline named in the minimum price clause of the contract. It admitted they were chemically different, and it offered no proof that they were the same in cost or value. The situation in that regard between the parties arose early in 1932. It was called to the attention of appellant by appellee in a letter of March 5, 1932, in which, after quoting the minimum price clause in the contract, it said:

"Under the present quotations published by the various Petroleum Papers and Magazines, 58-60 U. S. Motor is now split into three different grades according to the Octane Count."

It took the position that the minimum price referred to in the contract should be the average of the quotations on 57-64 and 65 and above octane counts, and that the quotations on the same octane counts as to 60-62, 400 endpoint in the maximum price clause should likewise be applied. Appellant declined by letter of March 17 the suggestion that the minimum price should be the average of the two higher octane quotations and said that the minimum price should be the quotation on 57 octane and below less two cents per gallon and that it would agree that the maximum price should not exceed one cent per gallon over Platt's Oilgram quotations for U. S. Motor grade 57 octane and below. The parties could not agree as to what should be done about the maximum and minimum price clauses, but they did agree that deliveries should continue, leaving the controversy to future adjustment. Appellant paid all it was billed for, $416,614.02, which was the base price of the natural gasoline received during the ten months, but refused to pay approximately $91,000 which appellee demanded under the minimum price clause of the contract based on quotations of U. S. Motor gasoline 57-64 octane as quoted in the Chicago Journal of Commerce.

Appellee replied on March 25th that it was in error in suggesting that the lower bracket (57 octane and below) be eliminated when computing the average price, and that it would agree that the average price should be on the average of the three grades specified and quoted. On May 31, 1932, appellant, because of the situation and disagreement, gave appellee notice of cancellation of the contract in accordance with its terms and that the contract would cease six months after the date of the notice, and further said:

"We are taking the position that the minimum and maximum price governed by clause numbered five (5) of the contract, for all deliveries since the date of first publication in the Chicago Journal of Commerce, will be based on the quotations for below 57 octane number as published in that publication and payments will be made accordingly."

On June 25, 1932, appellee acknowledged receipt of appellant's letter of May 31, and among other things said:

"Our final conclusion is that the minimum price shall not be less than 2c under the average of the three grades of U. S. Motor gasoline on quotations as published by the Chicago Journal of Commerce and the maximum price to be paid shall not be more than the average of the three grades of 60-62—400 end point gasoline on quotations as published by the Chicago Journal of Commerce. * * *

"You are aware of the fact that where U. S. Motor gasoline is contracted for and delivered since the octane rating has been published, where no octane number is specified, the middle grade of 57-64 octane number has become by custom the designated U. S. Motor Gasoline."

It is an additional cost to develop in U. S. Motor gasoline or in 58-60 U. S. Motor gasoline the designated octanes, and the quoted prices on the 57-64 octane in the Chicago Journal of Commerce during the period in question were uniformly higher than the reasonable or the market price of 58-60 U. S. Motor gasoline, increasing in amount as the octanes increased. We say this because appellant's technologist, who theretofore had been its chief chemist at one of its refineries, testified that it cost more to manufacture an article with a high anti-knock quality because in doing so it would decrease the amount of gasoline that could be produced unless lead was used and if lead be used that would cost money, and that in order to get into a higher bracket of octane rating a more excellent product is produced. There would be less recovery and more residue. We say this also be-

cause Platt's Oilgram published prices on the Chicago market for a few days in October, 1931, of 58-60 U. S. Motor gasoline and of U. S. Motor gasoline with the three octane brackets, which disclosed market prices of 58-60 U. S. Motor and of U. S. Motor below 57 octane were substantially the same, and each of them was uniformly lower than its quotations of U. S. Motor 57-65 octane; also because a witness testified that in his opinion 58-60 U. S. Motor gasoline was fairly comparable to the below 57 octane gasoline when the change to octanes was made, and that there was no doubt the anti-knock qualities would increase the value of the gasoline. If appellee may deduct two cents from the quoted prices of "U. S. Motor gasoline 57-64 octane" on every gallon delivered during the ten months rather than from the prices of 58-60 U. S. Motor gasoline, it was entitled to the judgment for about $91,000, which it recovered. It made that deduction by using the quotations in the Chicago Journal on "U. S. Motor gasoline 57-64 octane." The amount recovered below is substantially equal to that manner of applying the minimum price clause of the contract and constitutes the one issue here.

Of course, appellee could not apply the minimum clause according to its literal terms, because there were no quotations in the Chicago Journal of Commerce on 58-60 U. S. Motor gasoline during the period in controversy. To prove its claim appellee proceeded in this way: It adduced evidence that prior to October 1, 1931, the Chicago Journal quoted prices on 58-60, 437 endpoint (U. S. Motor); that gasoline of those specifications was a good motor gasoline, accepted and used by the public as a regular automobile gasoline; that those quotations were based on reports to the Chicago Journal of Commerce by the trade that it was good, regular grade; that the trade understanding was that it was a good, regular grade of gasoline; that good, regular gasoline was put out during competitive conditions by different companies under names which they each arbitrarily selected, called house brands; that in making the change to octanes the Chicago Journal of Commerce in its quotations columns first dropped out 437 endpoint and just used the words U. S. Motor; that after October 20, 1931, they dropped out 58-60; that gravity (designated by 58-60) disappeared as an important thing and oc-

tanes became the important thing; that the product quoted in the Chicago Journal of Commerce in 1931 and thereafter as "U. S. Motor 57-64 octane" was the same commodity in popular use and esteem as theretofore designated in the Chicago Journal of Commerce as 58-60 U. S. Motor gasoline, although they were chemically different; and that the house brands were the same in popular use and esteem as the two commodities just named, although chemically different from each.

Appellant's uncontradicted proof established that the octane content or counts in house brands differed widely as between various companies, and that there was a wide difference in the octane count from time to time of a house brand of any particular company. For example, the Empire Company put out a house brand called its Regular. Analyses made by appellant of 22 samples of this house brand beginning with March, 1929, and into January, 1933, disclosed that in 20 of them the octane count was less than 57, and in only one of them was the endpoint as high as 437°, and in 11 of the samples the gravity was outside of 58-60. A sample of Cities Service Koolmotor brand taken and analyzed in July, 1931, showed an octane count of 58, endpoint 411°, gravity 60.3. A sample of Skelly in June, 1930, showed an octane count of 49, endpoint 404°, gravity 60.2. A sample of Shell in June, 1930, showed octane count 56, endpoint 396°, gravity 60.5. A sample of Texaco in 1929, showed octane count 52, endpoint 400°, gravity 59.9. A sample of Texaco in 1932 showed octane 63, endpoint 395°, gravity 59.7. A sample of Phillips in 1932 showed octane 63, endpoint 422°, gravity 63.8. Defendant's witness, who testified to the making of the analyses above referred to, also testified that in 1932 and prior thereto a large number of house brands had the octane number that would place them in the lower bracket in the octane rating scale, that is, the octane number would be 57 or lower.

The base price for the gasoline delivered throughout the period in controversy was to be ascertained from the quotations in Platt's Oilgram. There is no dispute about that. The controversy is over the clause in the fifth paragraph which sets up a formula for ascertaining the minimum price which the seller was to receive. For that purpose it was the intention of the parties to use the market price to be as-.

certained from monthly average quotations in a trade journal of a different commodity than that purchased, from which the deduction of two cents per gallon should be made. Certainly they did not intend to be bound by quotations that were carelessly made and not fairly in accord with market prices. It was not contemplated that those quotations would cease, but would continue for the life of the contract. Neither party was responsible for their cessation, and neither should be made to suffer damage on that account, or forego its rights under the contract if they can be established by competent proof. The quotations were not intended as mere formalities. They were to represent market price, and if proof is obtainable as to what the market price of 58-60 U. S. Motor gasoline was during the time in question it must be inferred that the quotations if they had been made would have been in accord.

On the whole case it is our conclusion that the proof fails to support appellee's claim. 58-60 U. S. Motor gasoline was not the same in any material respect as U. S. Motor 57-64 octane, in quality, market price, or value. Rather, the proof, though slight, tends to support the conclusion that 58-60 U. S. Motor closely approached what came to be known and quoted in the Chicago Journal of Commerce as U. S. Motor below 57 octane in quality, market price and value during the period in controversy, which, had it been accepted as controlling and determinative of the issue, would have resulted in a judgment for about $68,000 less than the one that was entered.

The allegations of the amended complaint on which the case was tried and the proof were not in accord. It was alleged that there were average quotations for 58-60 U. S. Motor gasoline in the Chicago Journal of Commerce for each of the ten months in question. Quotations for each month of 58-60 U. S. Motor gasoline were set forth. When the trial came on appellee sought to establish its case by proving quotations for each of those months for U. S. Motor 57-64 octane on the claim as above set forth that U. S. Motor 57-64 octane took the place of 58-60 U. S. Motor in public esteem and use as a good, regular gasoline. This theory was challenged by appellant throughout the trial without avail.

Reversed and remanded.